ROBERT E. KOVACEVICH and YVONNE R. KOVACEVICH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kovacevich v. Commissioner
Docket No. 34758-84.
United States Tax Court
T.C. Memo 1986-513; 1986 Tax Ct. Memo LEXIS 96; 52 T.C.M. (CCH) 814; T.C.M. (RIA) 86513; October 20, 1986. Robert E. Kovacevich, pro se. Dean H. Wakayama, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $ 20,753 in petitioners' Federal income taxes for 1978. The deficiency resulted from respondent's determination that petitioners were not entitled to deduct $ 40,000 depreciation claimed in relation to a master recording activity. By amendment to his answer, respondent claims additional interest under section 6621(d). [1]
FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners were residents of Spokane, Washington, at the time they filed their petition herein. They filed a joint individual income tax return for 1978. Petitioner Robert E, Kovacevich (Mr. Kovacevich) has been practicing law since 1960. He has an LL.M. degree in taxation from New York University, and his major area of practice is tax law. He is admitted *98 to practice before this Court and has represented taxpayers in numerous cases in this Court. Petitioner Yvonne R. Kovacevich (Mrs. Kovacevich) teaches piano. She is a trained and skilled musician from a musical family. She has from time to time engaged in various types of musical activity involving performing, teaching, and consulting. In 1977, petitioners became aware of a recording by Kim Jones (Jones) entitled "Leave Him Alone" (the record). They first discussed the record with Rob Aldridge (Aldridge), a former police officer who had moved from the Los Angeles area of California to the Spokane area of Washington and was engaged in locating business ventures. Aldridge introduced Mr. Kovacevich to Garland Culpepper (Culpepper), who was associated with The Sound of Nashville Music, Inc., in Atlanta, Georgia. Mr. Kovacevich also corresponded with Hank Levine (Levine), President of International Record Distributing Associates (IRDA) of Nashville, Tennessee, concerning the record, and obtained promotional copies of the record. Jones paid $ 8,000 in 1976 and $ 12,200 in 1977 for production of the record. The payments were made to Jimmy Bowen (Bowen). Bowen operated under the *99 name Bowen Arrow Productions. Jones did not enter into any written agreements with respect to production or distribution of the records with Bowen or with petitioners. Jones first heard of Mr. Kovacevich in the spring of 1978 and understood that he was investing in the distribution of the record. Petitioners thought that the best way to promote the record was to arrange for a tour of personal appearances for Jones, to "sweeten" the record by adding or omitting instrumentation or vocal accompaniment, and to produce a single record from the album. Sometime in 1978, petitioners received publicity photos of Jones and communicated with her about the record. Mr. Kovacevich also sent copies of the record and photos to various third persons in an attempt to arrange personal appearances for Jones. The personal appearances, however, never materialized. On a Schedule C, Profit or (Loss) From Business or Profession, attached to their joint income tax return for 1977, Mr. Kovacevich reported a business activity consisting of retail sales of records. He reported gross receipts of $ 67, less royalties of $ 36, and claimed expenses of $ 34,000 for depreciation; $ 25 for telephone; and $ *100 95 out-of-pocket meeting expense. The depreciation was shown on the return as attributable to the record, reported as acquired in September 1977 at a cost of $ 100,000; petitioners claimed $ 4,000 first year depreciation plus $ 30,000 depreciation for 1977 under a method reported as "KIRO IRB, 1974-30." Petitioners also claimed investment tax credit of $ 10,000 in relation to the record. In a statutory notice of deficiency dated April 14, 1981, [2] respondent disallowed the depreciation and investment tax credit claimed with respect to the record, determining as follows: 1977   1(a)  Schedule C Loss/Record Sales
$ 34,089.00
It is determined that you are not entitled *101 to deduct a loss in the amount of $ 34,089.00 for the year 1977 because it has been determined that such loss was not incurred in a trade or business or with respect to property held for production of income. It is further determined that you are not entitled to deduct a loss in the amount of $ 34,089.00 for the year 1977 because the fair market value of the master recording, "Leave Him Alone", has not been established and your basis in the master recording is limited to its fair market value. Alternatively, it is further determined that the following expenses claimed by you are not allowable for the reasons stated: (i) Depreciation Depreciation claimed on your 1977 return in the amount of $ 34,000.00 is disallowed because you have failed to establish that the amount of depreciation claimed bears a proper relationship to a decline in the master recording's usefulness and because the following non-recourse note lacks economic substance: Master Recording Title
Amount of Note
"Leave Him Alone"
$ 90,000.00
The basis for depreciation is limited to the fair market value of the master recording per the government appraisals. * * * 1977  11(a)  Investment Tax Credit
$    193.00
*102 It is determined that the investment tax credit claimed on your 1977 return in the amount of $ 10,000.00 applicable to the purported purchase of Master Recording, "Leave Him Alone", is not allowable because you have not established that you are the legal holder of the Master Recording, the rights, the title, and interest in the individual songs on the Master Recording. Even if you are the legal holder, the Master Recording does not qualify as property subject to investment tax credit. If the recordings do qualify as property subject to investment credit, the basis for purposes of calculating the credit would be limited to the fair market value which you have not established. The basis for calculating investment credit is limited to the fair market value of the Master Recording per the government's appraisals. In any event, the basis would not include the non-recourse note which is contingent and lacks otherwise economic substance. Accordingly, the tax liability on your 1977 return is increased $ 10,000.00. Petitioners filed a petition in the Tax Court with respect to their liability for 1977, docket No. 15910-81, but that proceeding was resolved by settlement without trial. *103 On a Schedule C attached to their 1978 joint income tax return, petitioners similarly reported activities relating to the record. They reported gross receipts of $ 11 and claimed depreciation of $ 40,000; postage of $ 8; and telephone expense of $ 30. In a statutory notice of deficiency dated July 9, 1984, respondent disallowed the $ 40,000 in depreciation claimed, stating: It is determined that you are not entitled to losses in the amount of $ 40,000 claimed with respect to your alleged purchase of a master sound recording because you have not established that: 1. You acquired sufficient equitable, legal or other interest in the recording to support the claimed losses; 2. You were engaged in a trade or business with respect to your alleged interest in the recording; 3. You held the recording for production of income; 4. You had a basis in the recording upon which to claim depreciation; 5. You placed the recording in service or acquired the recording available to be placed in service for purposes of claiming depreciation; 6. The method of depreciation claimed bears a proper relationship to the decline in the recording's usefulness. Respondent did not disallow *104 any portion of the expenses claimed for postage and telephone even though they exceeded $ 11 gross receipts reported. Medical expenses and sales tax deductions were adjusted to reflect the determination as to adjusted gross income. In 1982, after audit of their tax returns for 1977 and 1978 had commenced, petitioners renewed their interest in the career of Jones. They corresponded with Jones and her attorney during 1982. In 1985, they requested that Jones, who still had possession of the master of the record, send that master to a third person who, according to Mr. Kovacevich, was interested in the record. The master of the record was thereafter returned to Jones. Except for this incident in 1985, Jones retained possession of the master of the record. OPINION Noticeably absent from our findings of fact is any statement as to when and how petitioners acquired what from whom. These essential facts are missing because there is no evidence to support such findings. The documents offered or received in evidence at trial are copies, unsigned or partially signed, with blanks not filled in, substantially illegible, and not showing any connection between the artist, Jones, or the *105 producer of the record, Bowen, and petitioners. Thus we cannot even find with any degree of certainty that petitioners contracted with anyone concerning the record. Petitioners have the burden of proving that respondent's determination in the statutory notice, as set forth above, is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rockwell v. Commissioner,512 F.2d 882 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; Rule 142(a), Tax Court Rules of Practice and Procedure. They have totally failed to do so. [3] The scope of the problem is exemplified by our discussion of certain requested findings and the exhibits relied on by petitioners. *106 The Evidence
In support of a proposed finding that petitioners purchased the record in 1977, petitioners refer to Joint Exhibit 7-G. That exhibit is headed "EXHIBIT K SALES AGREEMENT," has various blanks that are not completed in a legible manner, and appears to be signed by a purchaser but does not identify petitioners. It refers to a purported sale of a master recording "as set forth in Exhibit 'A' attached hereto," but there is no Exhibit A attached. The "Sales Agreement" marked "Exhibit K" is mentioned in other exhibits. Exhibit 6-F is entitled "EXHIBIT J SERVICE AGREEMENT" and also has blanks filled in with illegible information. The typewritten date of the Service Agreement, however, is 1978, and the signature of the person described as "OWNER," i.e., the person having entered into the "Sales Agreement being attached hereto as Exhibit 'K'," is not either petitioner. Exhibit 20-T is a letter dated July 24, 1978, on the letterhead of "The Sound of Nashville Music," reciting "Enclosed herewith you will find partially executed copies of Service Agreements and a Sales Agreement which are to be executed by you with one copy being returned to us." The letter is not addressed *107 other than to "Dear Sir," but it is stamped "RECEIVED JUL 31, 1978" by Mr. Kovacevich's law offices. These documents do not tend to establish a purchase in 1977. Petitioners also request a finding as follows: The Petitioner executed documents of sale for a $ 100,000 purchase price that were transmitted and acted upon (TR. 74; TR. 77) (Exhibit 38-A, 37, 46, 47). Joint Exhibit 37-AK, Petitioner's Exhibit 47, and Respondent's Exhibit AO are all marked "Exhibit 'C'" and "PURCHASE AGREEMENT." All three have in common the same introductory language as follows: Purchase Agreement dated    , 1977 by and between    (the "Seller") having its offices at    and    (the "Purchaser") having its offices at    . WITNESSETH Whereas, Seller has agreed to sell and Purchaser has agreed to buy a total of    Master Recordings pursuant to the terms and conditions of this Agreement. Exhibit 37-AK does not have any of the blanks filled in and does not reflect any signature. Petitioner's Exhibit 47 does not have the blanks filled in at the beginning and appears to be a copy of signatures of R. J. Aldridge and Mr. Kovacevich. Exhibit AO has the blanks at the beginning filled *108 in with the date September 19, 1977, PacWest International as the seller and Robert Kovacevich as the purchaser. Nowhere in any of these three exhibits, however, is there an express reference to the record. Mr. Kovacevich, at the pages in the transcript cited in support of the finding he proposes, testified that he could not remember whether another exhibit was signed, and he merely identifies the copies marked as exhibits without providing the missing information or explaining the omissions. Also on the letterhead of PacWest International, Inc., is Exhibit 46, entitled "NON-RECOURSE PROMISSORY NOTE Exhibit 'B'." Blanks in that form are filled in with the amount $ 80,000 and the date September 19, 1977. The copy of the note appears to be signed by Mr. Kovacevich "subject to completion of formal closing." There is no evidence in the record of any formal closing. Exhibit 46 is substantially the same as Exhibit 38-AL, a blank typewritten form of nonrecourse promissory note not on the letterhead of PacWest International, Inc.
Petitioners contend that they paid $ 10,000 by a letter of credit. Joint Exhibit 9-I is an unsigned Application and Agreement for Commercial Letter of Credit *109 dated September 30, 1977, requesting a letter of credit in favor of Sound of Nashville Music, Inc., for the account of Robert E. Kovacevich, to Third National Bank in Nashville, Tennessee. Exhibit 45 includes a copy of a sight draft to Third National Bank in Nashville, Tennessee, dated February 13, 1978, in the amount of $ 10,000, drawn pursuant to a letter of credit dated October 26, 1977. There is no evidence, however, connecting the Sound of Nashville, Inc., to PacWest International, Inc., or either of those entities to Bowen or Jones. Jones testified at trial, categorically asserting that she always owned the master. At no time did petitioners identify or explain exactly how they purchased the record. Nor have they explained why they claimed a $ 100,000 basis for the record when the evidence at most shows a $ 10,000 payment in 1978 and an $ 80,000 nonrecourse note. Respondent requests a finding of fact as follows: "Petitioners never signed Kim Jones to an artist contract." Petitioners respond as follows: 11. Objection. Exhibits 13-M, 14-N, 22-V, 23-W, 25-Y, 34-AH and Pet. Ex. 55 indicates a royalty agreement on the record and in the aggregate reflect an agreement as *110 to profits by persons who sold the master to Petitioners. Nowhere in their brief, however, do petitioners identify the "persons who sold the master to Petitioners." We will, however, describe the exhibits referred to by petitioners in an effort to determine exactly what, if anything, they do indicate. Exhibit 13-M is a copy of a letter dated March 28, 1978, addressed to Mr. Kovacevich from an officer of International Record Distributing Associates (IRDA), reciting that it transmits a "contract" and requesting a check for $ 1,950. Exhibit 5-E is an unsigned document that purports to be a distribution agreement of IRDA, dated March 28, 1978, between IRDA and Arrow Records, 4603 South Pittsburgh, Spokane, Washington 49203 (petitioners' address). The name of the record is not written in a blank provided for that information. There is no evidence that this agreement was entered into by petitioners. Exhibit 14-N is a letter to Mr. Kovacevich dated May 11, 1978, from Janet Bowen, a companion of Jimmy Bowen, enclosing publicity photos of Jones. Although the letter refers to a possible personal appearance by Jones, it contains no terms of agreement. Exhibit 22-V is a letter *111 dated August 29, 1978, from Jones to Mr. Kovacevich referring to an unsuccessful booking effort. It contains no terms of agreement. Exhibit 23-W is a letter from Mr. Kovacevich to Jones dated September 3, 1981, that includes the following paragraph: Could you please furnish me with your agreement with Sound of Music wherein you were to get 41 cents out of each album? The reason that I would like a copy of the agreement is that I've never seen the agreement between you and Sound of Music or Album World and would like to use it as a pattern for all the agreements on royalties. As you know, you would have to reduce proceeds for everybody as we intend to combine several of the songs. Perhaps you are unwilling to do this but it would seem to me that a smaller portion of something is better than nothing. That portion suggests that, as of September 3, 1981, petitioners had no binding royalty agreements. Exhibit 25-Y is a letter from Mr. Kovacevich on the letterhead of Circle K Records dated November 4, 1981. That letter responds to an October 15, 1981, letter to Mr. Kovacevich from Jones in which she requests his assistance in financing the production of demonstration records *112 and asks that he respond to her attorney R. David Ludwick. In the letter responding to the attorney, Mr. Kovacevich stated "I have had several discussions with Miss Jones and also own her record cut in 1977 called Leave Me Alone." The November 4, 1981, letter contains no further description of purported terms of agreement between Mr. Kovacevich and Jones, and it does not reveal the manner in which petitioners purportedly acquired ownership of the record. Exhibit 34-AH is a letter to Mr. Kovacevich from Milo E. Bishop dated November 23, 1984. There is nothing in the letter referring to Jones or the record, although testimony at trial purported to connect Milo Bishop to an attempt in 1985 to promote the record. Petitioners' Exhibit 55 is an undated copy of what petitioners represent to be a royalty statement. Testifying about the document, Mr. Kovacevich suggested that it had been furnished to him by the president of IRDA, showing royalty disposition that might occur on sale of the record at a retail price of $ 6.98. It did not purport to reflect actual sales or disposition. It was received in evidence by the Court only to show the disorganized state of petitioners' records *113 and does not tend to prove any agreement. Petitioners argue that Jones failed to assert her ownership of the record during the years of correspondence between her and petitioners. None of that correspondence, however, called for such an assertion or could give rise to an adoptive admission or an admission by silence. See Rule 801(d)(2), Federal Rules of Evidence. By contrast, and in view of Mr. Kovacevich's training and experience as a lawyer, the jumble of unrelated documents, none of which is a fully executed original or duplicate original, can only be explained as unbusinesslike conduct at best [4] and as an attempt to deceive the Court and respondent at worst. In summary, the most favorable picture that we can draw from petitioners' standpoint is that they were interested in the career of Jones and engaged in some activities in relation to that career, deriving at most, "a royalty agreement on the record and in the aggregate * * * an agreement as to profits," as asserted by petitioners. Such an interest in the career of an artist would be consistent with the testimony of petitioners as to other musical activities. Such an interest, however, does not constitute an interest *114 in depreciable property. Cf. Tolwinsky v. Commissioner,86 T.C. 1009, 1041-1053 (1986). *115 In Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981), we stated: The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563, 570-571 (1965). The key to deciding whether petitioners' transactions * * * are sales is to determine whether the benefits and burdens of ownership have passed from * * * [the seller] to petitioners. This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances. * * * In this case we do not even have evidence of the written agreements, much less a clear understanding of the attending facts and circumstances. There is no basis for concluding that the benefits and burdens of ownership have passed to petitioners, in substantial part because petitioners have not even identified the sellers. To conclude that petitioners have totally failed to satisfy their burden of proof is, in this context, an understatement. Alternative Arguments
*116 Petitioners argue that, by settling the case involving their tax liability for 1977, respondent conceded that petitioners had title to the record. Although they also suggest that respondent did not previously raise a question of title, the quoted language from the notices of deficiency refutes that assertion. Respondent argues, correctly, that evidence of the compromise for 1977 is not admissible to prove any issue in this case. See Rule 408, Federal Rules of Evidence. As a general rule, the Commissioner is not estopped from correcting an error in a subsequent year, notwithstanding acquiescence in the treatment of the same item by the taxpayer in a prior year. See Automobile Club of Michigan v. Commissioner,353 U.S. 180, 184 (1957); Dixon v. United States,381 U.S. 68, 70-73 (1965); Easter v. Commissioner,338 F.2d 968 (4th Cir. 1964). With respect to the depreciation here in issue, petitioners must establish the amount that they are entitled to for 1978. As indicated above, they have not proven that they acquired depreciable property or that they gave any consideration other than, perhaps, $ 10,000 in cash and an $ 80,000 *117 nonrecourse note. Even assuming that they in fact gave a nonrecourse note to the seller of a master recording, there is nothing in the record to indicate any likelihood that the note would ever be paid. See Estate of Baron v. Commissioner,83 T.C. 542, 551-553 (1984), affd. 798 F.2d 65 (2d Cir. 1986), and cases cited therein. Petitioners have purportedly elected a sliding scale method of depreciation, as discussed in KIRO, Inc. v. Commissioner,51 T.C. 155 (1968). Petitioners have not, however, presented evidence of any of the elements supporting use of that method of depreciation. Petitioners have not explained their calculation of the $ 40,000 claimed in relation to an alleged $ 100,000 basis, and there is no rationale or factual predicate for allowing them the depreciation claimed. See Abramson v. Commissioner,86 T.C. 360, 376-378 (1986). [5]
*118 Respondent alternatively argues that petitioners have not shown that they engaged in their activity in relation to the record with an actual and honest profit objective. See, e.g., Estate of Baron v. Commissioner, supra.Although our conclusions set forth above make discussion of this issue unnecessary, it seems obvious that petitioners have not established that they had an actual and honest profit objective. Given the sporadic, disorganized and unbusinesslike approach of petitioners to the activity ( sec. 1.183-1(b)(1), Income Tax Regs.), they have not persuaded us that the result here should be different than that in Baron and the numerous other master recording cases previously decided by us in which nonrecourse financing was used "to jack up basis without underlying economic substance or entrepreneural risk." Snyder v. Commissioner,T.C. Memo. 1985-9. See, e.g., Harmon v. Commissioner,T.C. Memo. 1986-305; Seely v. Commissioner,T.C. Memo. 1986-216; Holland v. Commissioner,T.C. Memo. 1985-626, on appeal (9th Cir., July 18, 1986); Watts v. Commissioner,T.C. Memo 1985-531; *119 Cronin v. Commissioner,T.C. Memo. 1985-83. Petitioners attempt to distinguish these and other cases on the grounds that Mrs. Kovacevich is a professional musician and they engaged in other investments having a relationship to the music business. Mrs. Kovacevich's status, however, arguably could indicate that she engaged in these activities for personal pleasure. See section 1.183-2(b)(9), Income Tax Regs. Petitioners disagreed with each other in their testimony as to their experience in the master recording activity described in Looney v. Commissioner,T.C. Memo. 1985-326, on appeal (9th Cir., Mar. 28, 1986), but neither version supports petitioners' contentions in this case. They have not shown any financial success in any similar venture. See sec. 1.183-2(b)(5), Income Tax Regs.
Petitioners argue that respondent conceded that they were in a trade or business or held property for the production of income, negating the applicability of section 183, by not disallowing the $ 27 excess of miscellaneous expenses over income that they claimed on their tax return for 1978. This argument is absurd *120 in view of the de minimis amount involved and the express language of the statutory notice. The parties have raised various other arguments concerning petitioners' entitlement to the depreciation deduction claimed in 1978. We have considered them and find them unpersuasive and unnecessary to address in this opinion. There remains, however, the question of whether petitioners are liable for additional interest on the deficiency under section 6621(d). [6]
Additional interest under section 6621(d) was initially raised by amendment to the answer filed when this case was first called for trial. The amendment to the answer predicates the claim for additional interest on a valuation overstatement within the meaning of section 6659(c), incorporated into the definition of tax motivated transactions *121 by section 6621(d)(3)(A)(i). In his brief, respondent also claims that the additional interest is appropriate because the deduction should be disallowed under section 183. Section 301.6621-2T, Q-4 and A-4, Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 50392 (Dec. 28, 1984). Respondent bears the burden of proof in support of these contentions. Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioners do not argue that the alternative ground, section 183, first raised in respondent's brief is not properly before the Court. Petitioners argue that section 6621(d) cannot be retroactively applied to the deficiency for 1978. The section, however, is effective as to interest accruing after December 31, 1984, and is not impermissively retroactive. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Petitioners contend that section 6659 is not applicable because fair market value is not an issue in this case, citing Chung v. Commissioner,T.C. Memo. 1986-131. Although Chung does not stand for the proposition that petitioners assert, they are correct *122 that basis, and not fair market value, is the amount that must be determined in relation to their entitlement to depreciation deductions. See sections 1.167(a)-1 and (g)-1, Income Tax Regs. What petitioners overlook, however, is that section 6659(c) (formerly 6659(c)(1)), specifically states that "there is a valuation overstatement if * * * the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct * * * adjusted basis * * *." Nonetheless, although respondent produced expert testimony that the fair market value of the master recording was not more than $ 5,000, respondent did not prove the correct amount of petitioners' adjusted basis. Our conclusion that petitioners have not satisfied their burden of proof as to depreciable basis does not satisfy respondent's affirmative burden. Petitioners may or may not have entered into contractual arrangements concerning the record; they simply have not proven that they did. Respondent has presented only Jones' denial that she sold the master recording to anyone, and the gap in the evidence as to the parties dealing with petitioners is fatal to respondent's claim as well as *123 to petitioners. Similarly, our conclusion that petitioners have failed to prove a profit objective does not satisfy respondent's burden of affirmatively proving that they did not have a profit objective. In summary, neither petitioners nor respondent has presented persuasive evidence on the issues on which they respectively bear the burden of proof. Nor have they presented a cohesive or consistent theory connecting the evidence in this case to the legal contentions that they respectively assert. Our decision here is based on our independent evaluation of the evidence and the applicable authorities. Decision will be entered for the respondent for the amount set forth in the statutory notice.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. The notice of deficiency was a subject of a separate proceeding in this Court, docket No. 15910-81, and was thus part of the public record of which the Court may take judicial notice. For convenience, a copy was marked as part of the record in this case. As discussed in the opinion below, petitioners argue that resolution of the dispute for 1977 affects the determination of their liability for 1978. The facts concerning 1977 are, therefore, set forth as a predicate to this discussion.↩
3. Our task was not assisted by the briefs of the parties. Petitioners' requested findings of fact and objections to respondent's requested findings of fact are substantial exaggerations on and misstatements of the evidence. Respondent's proposed findings are in substantial part recitals of evidence ("Exhibit    is    ," "[the witness] stated * * *,"), and his objections ("uncorroborated, self-serving testimony") are unpersuasive in the absence of contradiction or inherent incredibility of the testimony. See Rule 151(e)(3), Tax Court Rules of Practice and Procedure.↩ Both sets of requested findings are lacking in any discernable organization.
4. Comparable lack of businesslike conduct by a nonlawyer has been given as a reason for holding that the taxpayer did not have an actual and honest profit objective in entering into a master recording activity. See Watts v. Commissioner,T.C. Memo. 1985-531, in which we stated: [P]etitioner did not handle the purchase of the master recordings in a business-like manner. Sec. 1.183-2(b)(1), Income Tax Regs. Most of the documents -- the purchase agreement, the recourse promissory note, the nonrecourse, nontransferable promissory note, security agreement, sample sales agency agreement * * * were forms attached to a "confidential memorandum" issued by * * * [the promoter] to potential purchasers of its master recordings. The blanks in these prepackaged forms were appropriately filled in, but their terms were not changed. In fact, the designation "Exhibit B" was not deleted from the "Purchase Agreement" and the word "Sample" was not even stricken from the heading of the "Sample Sales Agency Agreement." [50 T.C.M. 1295 at 1300, 54 P-H Memo par. 85,531 at 85-2390-85-2391.] A similar conclusion was reached in an activity arranged by Mr. Kovacevich and engaged in by petitioners in Looney v. Commissioner,T.C. Memo. 1985-326↩, on appeal (9th Cir., Mar. 28, 1986).
5. Petitioners argue that their renewed activity with respect to the record in 1985 coincided with greater opportunities for profit upon the expiration of the nonrecourse note in 1985. In addition to confirming that the note was not intended to be paid, this argument would undermine the propriety of claiming depreciation in 1978, inasmuch as the depreciation method adopted is intended to match income and deductions. See KIRO, Inc. v. Commissioner,51 T.C. 155, 170-173 (1986). It seems to us that petitioners' post-audit activities with respect to the record are more likely "window dressing" intended to aid them in this litigation. See, e.g., Thomas v. Commissioner,84 T.C. 1244, 1277, 1281 (1985), affd. 792 F.2d 1256↩ (4th Cir. 1986).
6. SEC. 6621(d) Interest on Substantial Underpayments Attributable to Tax Motivated Transactions. -- (1) In general. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the adjusted rate established under subsection (b).↩